Joseph Maskaliunas, by Joseph Maskaliunas, Sr., Appellee, v. Chicago and Western Indiana Railroad Company, Appellant.

Gen. No. 28,837.

1. RAILROADS—*evidence of negligence by railroad in failing to fence right of way pursuant to speed ordinance.* In an action for injuries to a child by one of defendant's trains within the city limits of Chicago where there was testimony that fences had been built along the tracks 25 or 30 years prior to the accident by the railroad company and maintained by it for a time but had been allowed to get out of repair; that such fences were not built in accordance with ordinances limiting the speed of trains to ten miles an hour for passenger and six miles for freight trains unless fences as specified were built; and that trains were run at speeds allowed only when the proper fences were maintained; and there also was put in evidence copies of letters written to defendant by

the proper city authorities notifying defendant to erect the proper fences, there was ample evidence to justify the jury in determining that the defendant had failed in its duty to fence the place in question.

2. RAILROADS—*want of fence on right of way as proximate cause of accident of injury of trespasser as jury question.* Where a young boy playing near defendant's railroad tracks in the city limits of Chicago at a point where no fence was maintained along the right of way, as was required by ordinance, went upon the right of way and attempted to catch on a passing freight train and was thrown under the wheels, whether the absence of a fence was the proximate cause of the injury was a question for the jury.

3. RAILROADS—*presence of young child on unfenced right of way as contributory negligence as jury question.* Whether a child seven years and ten months of age was chargeable with contributory negligence in attempting to catch on defendant's freight train and whether such negligence intervened as a disconnected efficient cause which could not have been foreseen by the exercise of ordinary care on the part of the railroad company as a result of its failure to fence its track as required by ordinance, were properly submitted to the jury.

4. RAILROADS—*propriety of refusal to give requested instruction in injuries case.* In an action for injuries received by a boy seven years and ten months old when he attempted to catch on defendant's freight train, in which the negligence charged was defendant's failure to fence its right of way as required by ordinance, an instruction offered by defendant that if plaintiff "at and immediately prior to the time of the happening of the accident in question went upon the right of way of the defendant railroad company and flipped or attempted to climb onto the freight car in question of his own initiative and accord and not because of the fact that there was no fence along the right of way of the railroad company, then and in such case you should find the defendant not guilty," was ambiguous and was properly refused.

5. DAMAGES—*reduced purchasing power of money as test of reasonableness of verdict for injuries.* Considering the present purchasing power of money a verdict that ten years or more ago might have seemed extravagant and unjust may be well within the bounds of reason.

6. DAMAGES—*excessiveness of verdict in personal injuries case.* A verdict for $25,000 damages in an action for injuries to a boy seven years and ten months of age whose leg was cut off a few inches below the knee, the verdict including not only the personal injury but also whatever the boy's father might have for the loss of the son's services during his minority, cannot, considering the

economic condition of the times, be said to be so excessive as to require that it be overridden.

7. APPEAL AND ERROR—*judicial notice by Appellate Court of economic conditions.* In an action for personal injuries to a boy less than eight years old, which resulted in the loss of a leg, the Appellate Court will take judical notice of the economic conditions of the times resulting in diminished purchasing value of money.

THOMSON, J., dissenting.

Appeal by defendant from the Superior Court of Cook county; the Hon. JOSEPH H. FITCH, Judge, presiding. Heard in this court a♣ the October term, 1923. Affirmed. Opinion filed December 24, 1924. Rehearing denied January 6, 1925.

EDWARD W. RAWLINS and CHARLES O. FOWLER, for appellant; H. T. DICK and D. H. MANN, of counsel.

FINN & MILLER, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

On January 20, 1922, Joseph Maskaliunas, Jr., minor, by his next friend, Joseph Maskaliunas, Sr., brought suit in the superior court of Cook county against the defendant, Chicago and Western Indiana Railroad Company, to recover damages for personal injuries received by him on the defendant's railroad. The trial resulted in a verdict and judgment for the plaintiff in the sum of $25,000. This appeal is from that judgment.

The gravamen of the suit is the alleged failure of the defendant to construct and maintain a fence along its right of way, as required by ordinances of the City of Chicago.

The declaration contained three counts. The first charged, in substance, that, pursuant to certain ordinances and notice from the proper officers of the City of Chicago, the defendant constructed a fence along its right of way, but, owing to its negligent maintenance of the fence, the plaintiff, a boy then seven years

Maskaliunas v. Chicago & W. I. R. Co., 235 Ill. App. 198.

and ten months of age, got upon the railroad track of the defendant and was run into and injured.

The charge of the second count is similar, save that it does not allege that the defendant was notified by the officers of the city to construct a fence along its tracks.

The third count charges that it was provided by ordinance that if the defendant constructed a wall or fence, inclosing its tracks, it would not be bound to a maximum rate of speed for passenger trains of ten miles an hour, and freight trains of six miles an hour; that the defendant, for a long time prior to the accident in question, ran its trains at a rate of speed greatly in excess of the ten miles and six miles, allowed, thus enjoying the benefits of the ordinance, although it did not, at the time in question, inclose its tracks by a properly maintained fence or wall.

The evidence shows the *locus in quo* to be as follows: The tracks of the defendant railroad where the plaintiff was injured and in that vicinity ran in a northerly and southerly direction between 103d and 104th streets, two east and west streets in the City of Chicago. There are three tracks on the right of way; one a northbound main; one a southbound main, and a west track upon which the freight train involved in the accident in question was being operated. North of the place of the accident, the defendant's right of way is intersected by 103d street. One-hundred and Third street runs across the railroad tracks, and contains a street car line. One-hundred and Fourth street stops at the east side of the tracks. On the east of the right of way from 103d street, south to 104th street, there is a public park, on part of which is located a large brick building known as a natatorium, or swimming pool, belonging to the City of Chicago. That building is just east of the right of way at a point where 104th street if extended would cross the defendant's tracks. North of 103d street, on the east side, there is a farm and on the west side a

park. The swimming pool faces to the east and extends in a northerly and southerly direction, its west side running north and south along the right of way. It has an entrance, also, at the north end of the building in the park. Along the north end, east and west, there is a sidewalk which extends to the railroad right of way. The territory in the vicinity of 103d street is quite well built up. There is no fence on either side of the railroad's right of way between 103d street and 104th street, although some fence posts still remain of a fence that had once been constructed in that vicinity along the right of way. There was, in reality, no fence separating the right of way of the railroad and the north end of the swimming pool or public park.

As to the occurrence itself, the evidence shows, substantially, the following: At the time of the accident the plaintiff was seven years and ten months old, and lived at 135 West 103d street. On the day in question he went to the swimming pool and had a swim, and then went to Fernwood Park, about five blocks away, north and west, and watched some boys playing ball. He then walked back east on the sidewalk on 103d street, to the right of way of the defendant, then turned in south on the right of way and walked along at the side of the tracks, whether east or west of them is not definitely shown, south towards the swimming pool. He then went east and got on the sidewalk just north of the swimming pool. From there he went to a rubbish pile that was upon the railroad right of way, and about twenty feet east of the tracks, to look for rubber bands. From there, after looking for rubbers, he went into some bushes, which were a little north of the swimming pool and east of and off the right of way. There is some controversy as to whether he got off the right of way of the defendant, but the evidence shows that a mark "A" on a photograph entitled, "Plaintiff's Exhibit 6" was placed there by the court reporter at the trial

Maskaliunas v. Chicago & W. I. R. Co., 235 Ill. App. 198.

as showing the place where the plaintiff testified he went to look for some funny papers; and that that place is east of the right of way, practically just north of the west end of the sidewalk and north of the swimming pool. It was shown, also, by the same photograph that the bushes in question were east of the right of way of the defendant. He found some funny papers, read them through, and then, seeing a freight train coming south, there being no fence there, between him and the tracks, he ran across, over the two tracks, about west of the swimming pool, and undertook to climb on one of the moving freight cars. He got hold of the grab iron, and then was swung under or fell in such a way that he was run over and his right leg so injured that it had to be amputated below the knee. The injury occurred between 4 and 4:30 p. m., September 29, 1921.

Another boy, one of his playmates, testified that he was with the plaintiff; that he was picking up broken rubbers, and that they were at the back end of the swimming pool on the sidewalk; that he, the witness, was standing at the end of the sidewalk; and the plaintiff was with him; that they found some funny papers and looked them over. Another boy, unknown to the plaintiff, testified that, at the time in question, he saw two other boys get on the freight train ahead of the plaintiff. The evidence of the engineer of the freight train is that he saw three boys along the right of way, two of whom undertook to get on and that he told them to keep away; that two of them stepped back a little, and then, immediately afterwards, the third one tried to get on again, and that a brakeman who sat on the side of the car told them to keep away from the car; that when he warned the boy the first time he was trying to get on the first car next to the engine; that his last attempt was the third one that he made; that he finally caught hold and seemed to swing in between the cars; that

the brakeman then gave the signal to stop; that the car on which he tried to get was about twenty cars from the engine.

The evidence of a switchman is to the effect that the freight train was traveling about six miles an hour when it passed through Fernwood; that he there saw five or six boys playing on the main track and saw some of them get on the train; that he warned them to stay off the train, and that among those he warned was the plaintiff; that at first the plaintiff stepped back on the other track, and then afterwards attempted to get on again, and the last he saw of the plaintiff was when he reached for the grab iron and he disappeared in between the cars; that he then gave the signal to stop; that at the time the plaintiff tried to get on the train the switchman was three or four cars away from him.

His evidence is, further, that there were two sets of boys on the tracks, five or six on the northbound main track, and five or six where the plaintiff was; that there were fifteen or twenty boys scattered along the right of way; that their ages ran up to sixteen or seventeen years; that quite a number of the boys tried to get on the train; that he saw two on the train; that he saw the plaintiff try to get on and shouted at him; that, at the time, the train was going only five or six miles an hour.

In view of the contentions of the defendant, the following matters are involved: (1) the evidence, if any, tending to show that there was an obligation on the part of the defendant to construct or maintain a fence along the right of way; the evidence concerning the ordinance and whatever notice was given; and the speed of the trains of the defendant as an evidence of adoption of the requirements of the ordinances; (2) the absence of a fence in its relation to proximate cause; proximate cause; and contributory negligence, if any; (3) the instructions; and (4) the amount of the judgment.

(1)   Evidence was offered to show, and it was not denied, that at one time there was a fence along the right of way, but it is contended that it was built about thirty-five years before the trial; that the territory did not become part of Chicago until after the passage of the ordinance; and that the evidence as to the fence shows that it was not built because of the ordinance.   Concerning the history of the fence, in question, four witnesses were called on behalf of the plaintiff:   Bandermyde, a truck farmer who had been familiar with the place for 21 years, and had a farm east of the right of way from 103d street north to 101st street; Magnus, who worked between 9 and 10 years, at the crossing on 103d street, for the defendant; Ton, a truck farmer, who had been familiar with the locality for some 34 years, and had a farm in its vicinity, and Decker, a retired truck farmer, who had lived in that neighborhood for 45 or 47 years.   No witnesses were called on that subject by the defendant.   The evidence of Bandermyde was that when he first went out there, 21 years before the trial, there was a barbed-wire fence along the east side of the right of way which had fairly good wooden posts; that it was "kind of broken down at the time, but was repaired shortly thereafter, but not by the land owner"; that afterwards it was neglected and now there is nothing but some posts left; that "it got in poor condition at the time they had the track—laid the third rail there" 6 years ago.   On cross-examination, he stated that when he was a boy and lived out there it was all fenced in farm land; that the farmers began putting up fences 35 years ago; that 21 years ago there was an old fence, partly decayed and broken down, running north and south on both sides of the track, which was repaired shortly afterwards; that he could not remember its condition 35 years ago; that when he first went out there "it was an old fence because we complained because we had brought some

cattle in there, and they repaired the fence, the rail-
road company"; that the same posts are there now,
and may have been there, possibly, 20 years before
he went there.  He described the fence as a wire
fence, the top wire being barbed and the lower ones
smooth; that the fence was about 3½ or 4 feet high:
just an ordinary fence to keep the cattle out.  On re-
direct examination, he said he complained about the
fence to the section foreman when he came along in a
hand car to repair fences, and that the fence was then
repaired.

The evidence of Magnus is that he worked on the
railroad crossing at 103d street for 9 or 10 years,
until about a year prior to the trial of this case; that
when he first worked there the fence was falling down,
and that on several occasions he saw the fences re-
paired by men who came in hand cars.

The evidence of the witness Ton is to the effect that
about 30 years ago there was a fence there, built by
the railroad 25 or 30 feet from the tracks.  On cross-
examination, he said that there was a farm fence
there before the railroad came; that the railroad
tracks were laid through there some 30 or 34 years
ago; that the railroad built, about that time, a barbed-
wire fence, though he is not sure that all the wires
were barbed, but the fence was put up about the time
they got the tracks built; that the fence was built be-
fore that area was taken into the City of Chicago.

The evidence of the witness Decker is to the effect
that there was a fence along the railroad right of way
30 or 35 years ago; that the fence on the east side
disappeared about 7 or 8 years ago, except for a few
posts.  On cross-examination, he testified that the
fence along the right of way was built by the railroad
shortly after the railroad was constructed; that when
they got the tracks in they built a fence.

As to the time when the *locus in quo* was taken
into the City of Chicago, Bandermyde says it was

30 years ago; Decker 25 years; and Ton, about 30 years ago. As to the speed of the trains that were run, Bandermyde says the passenger trains in September, 1921, traveled on an average of 30 miles, the fast freight at about 25 miles, and that that has been going on since the railroad started, or since the trains could go that fast; Magnus, the crossing man, put the speed at 35 miles an hour; Ton, at 30 to 40 miles an hour.

From the foregoing it will be seen that the evidence of Bandermyde, Ton and Decker, which constitutes the only evidence on the subject, is to the general effect that a fence was built along the railroad right of way 30 or 35 years ago, and that it was built, according to Ton and Decker, by the railroad, and was built before that area was taken into the City of Chicago. The testimony on the subject of the origin of the fence is somewhat vague and indefinite, and necessarily so considering the lapse of time, but practically all of it tends to show that the fence was built originally along the right of way prior to March, 1890, and so could not be considered as any basis for the determination of the jury that the fence was built subsequent and pursuant to the ordinance of March, 1890. Likewise, it must be said that the testimony of Bandermyde, Ton and Decker, which constituted all the evidence on the subject, was practically all to the effect that the *locus in quo* was not part of the City of Chicago at the time the ordinance of March, 1890, was enacted; and, from that, it follows that there was no evidence that the fence originally built was put up pursuant to that ordinance. Further, what evidence there is on the subject as to the kind of fence that was built—Bandermyde says it was a wire fence 3½ or 4 feet high; Ton says it was a farm fence—shows that it was not such a fence, 7 feet high, as was required by notice under the ordinance.

The ordinances involved are the following: (1)

an ordinance enacted on March 26, 1890, which provides (section 1750) that every corporation "operating a steam railroad within * * * the City of Chicago, shall, within such time as may be prescribed by the mayor and commissioner of public works, construct * * * on each side of the tracks, and in such place with reference thereto as the mayor and commissioner of public works shall approve or direct * * * substantial walls or fences of such material, design, proportion and height as shall be determined and approved by the mayor and commissioner of public works"; (2) the same ordinance, reenacted in 1905 in the Revised Municipal Code of the City of Chicago of 1905, which provides (section 1994) that every corporation "operating a steam railroad within the city, shall, within such time as may be prescribed by the city council, construct * * * on each side of its tracks, and in such place with reference thereto as the city council shall direct, except where public streets shall intersect or cross the same, substantial walls or fences of such material, design, proportion and height as shall be determined and approved by the mayor and commissioner of public works"; (3) a re-enactment of that ordinance in the Revised Municipal Code of the City of Chicago for the year 1911, which provides (section 2198) that every corporation "operating a steam railroad within the city, shall, within such time as may be prescribed by the city council, construct * * * on each side of its tracks, and in such place with reference thereto, as the City Council shall direct, except where public streets shall intersect or cross the same, substantial walls or fences of such material, design, proportion and height as shall be determined and approved by the mayor and commissioner of public works"; and (4) an ordinance of the City of Chicago which provides (section 2183) that "no railroad company shall * * * run any passenger train * * * within

the corporate limits of the city at a greater rate of speed than ten miles an hour; nor   *   *   *   run any freight car or cars   *   *   *   within said city at a greater rate of speed than six miles an hour, except as hereinafter otherwise provided in section 2199.'' Section 2199 is another section of the latter ordinance, and provides for certain rates of speed (30 and 12) in certain outlying regions of Chicago where section 2198, above mentioned, has been fully complied with. The ordinances pleaded in this case are the same as in *Carlin v. Chicago & W. I. R. Co.*, 297 Ill. 184, which affirmed *Carlin v. Belt Line Ry. Co.*, 218 Ill. App. 643, and in *Livak v. Chicago & E. R. Co.*, 299 Ill. 218.

As to notice to fence its tracks, one of the contentions in the argument for defendant is that it was not obliged to comply with the requirements of the ordinance until it had been notified to do so, and that there was no proof that notice had ever been given. Undertaking to prove notice, under the ordinances, the plaintiff offered in evidence certain letterpress copies of letters and documents, all of which were received in evidence over the objection of the defendant. There was received in evidence a copy of certain papers from a docket entitled No. 1233, which a clerk from the office of the Commissioner of Public Works of the City of Chicago testified constituted part of the records in that office that were in his custody. One of those contained the words, ''The Chicago & Western Indiana Railroad Company: You are directed to construct a fence, seven feet in height, the character of which shall be approved by the Department of Public Works of the City of Chicago, inclosing your two main tracks now laid in what is known as Wallace street, from the south line of Forty-ninth to the north line of Eighty-first street, in the City of Chicago, as follows:   *   *   *   Said fence will be constructed under the immediate direction of the engineer of the City of Chicago   *   *   *   desig-

nated for that purpose, and of such material and model as heretofore agreed upon." The other paper was entitled "City of Chicago, Department of Public Works, April 2nd, 1890, General Specifications Relating to Walls, Fences, etc., for Protection on Railroad Right of Way. (Under ordinances passed by Council March 26, 1890.)" It then proceeded to prescribe the quality and height of the fences to be built. It also provides that when any portion of the property fenced in is dedicated for public travel, the railroad company, upon notice from the Department of Public Works, shall "proceed to remove the fence or wall and substitute in place thereof protection gates in accordance with the ordinance governing same." A letter dated April 18, 1890, addressed to the vice president and general manager of the defendant, and signed by the Commissioner of Public Works, was introduced in evidence. It recited that at the request of the defendant there was inclosed two copies of the general specifications as to the erection of fences, gates, etc., under the ordinance lately passed, and a permit to proceed issued in connection therewith. The letter also recites: "These documents are to be signed according to the form prescribed in same and copy retained by each party to the agreement."

What purports to be a copy of a letter dated September 23, 1890, addressed to several railroads, including the defendant, was also offered in evidence. That recites that on July 28 the City Council had passed an "order" directing that the Commissioner of Public Works require all the steam railroads which were in the City of Chicago to furnish a statement showing to what extent the ordinance recently passed requiring them to fence their rights of way had been complied with. It recited that the various railroads were requested to give the information in detail without delay. All those documents were put in evidence in the *Carlin* case. There was offered in

evidence a letterpress copy of a letter dated August 13, 1890, addressed to the vice president and general manager of the defendant, notifying the defendant that it had failed to comply with the ordinance of March 26, 1890, "relative to rate of speed, erection of fences and gates and stationing of flagmen at crossings," and that it had "failed to comply with the requirements of section 1830 of Municipal Code as regards speed of trains within the city limits." It also contains the following: "To obtain the benefits of the ordinance of March 26, 1890, you are instructed that it will be necessary to obtain a permit from this office allowing you to erect fences and run trains at rate of speed therein prescribed. Otherwise, we will be compelled to enforce the 10 and 6 hour limit as prescribed in section 1830." That letter purports to be signed by the Commissioner of Public Works.

There was also offered in evidence a letterpress copy of a letter dated January 8, 1891, by the Commissioner of Public Works, to the vice president and general manager of the defendant, in regard to the fencing of the defendant's tracks along a certain portion of Wallace street. That letter is set forth in full in both the *Carlin* case and in *Curran v. Chicago & W. I. R. R. Co.*, 289 Ill. 111.

At the trial, upon notice being served on counsel for the defendant to produce the original letters and specifications, he stated that the defendant had no such documents.

The foregoing papers and documents with the exception of the letter of August 13, 1890, which purported to notify the defendant that it had failed to comply with the ordinance of March 26, 1890, were offered in evidence (and considered properly admitted) in the *Carlin* case and in that case the court held that those letters and documents,—together with certain testimony that a fence had been built but had been allowed to become broken down and worn

out, and together with evidence tending to show that the railroad had operated its trains at the point in question for many years at a speed greatly in excess of that permitted by ordinance, where the tracks were not fenced—"fairly tended to show that defendant had been notified by the proper city authorities to fence its tracks; that it had at one time fenced them at the place in question, and had since enjoyed the benefit of operating its trains at the increased speed permitted where the tracks were fenced."

In the instant case, there was evidence that is not in the *Carlin* case, that is, that not only was there a fence built by the railroad along the right of way, but from time to time after March, 1890, it was repaired and maintained by the defendant. Bandermyde said that 21 years before the trial there was a barbed-wire fence; that it was "kind of broken down at the time, but was repaired shortly thereafter, but not by the landowner"; that it was repaired by the railroad company. Magnus, the crossing man, said that when he first worked there, which was about 9 years before the trial, the fence was falling down and that on several occasions it was repaired by men who came in hand cars.

On the subject of speed, the evidence shows that at the time of the accident the defendant was running trains at the maximum rate. Section 2183 of the ordinances of the City of Chicago limited the speed of trains to 10 and 6 miles an hour excepting as provided in section 2199; and the latter section provided for the erection of fences and when built that the speed could be 30 and 12 miles, respectively. Bandermyde said that trains were operated at 30 and 25 miles; Ton, 30 and 40 miles, and Magnus, the crossing man, 35 miles an hour.

Considering, therefore, the reasoning of the court as expressed in the opinion in the *Carlin* case, and the added fact that evidence here shows that the defend-

Maskaliunas v. Chicago & W. I. R. Co., 235 Ill. App. 198.

ant repaired and maintained a fence, it follows that there was ample evidence for consideration by the jury. In the *Curran* case there was no evidence that a fence had been built along the right of way at the point in question, and it is that feature which distinguishes it from the *Carlin* case as stated by Mr. Justice Farmer, in the opinion in the latter, and so, likewise, it is distinguished from this case.

In the instant case it may be that there is no express evidence that the *locus in quo* was part of the city in March, 1890, and no evidence that any fence had actually been built there by the railroad since that time; and that the various letters and documents admitted in evidence do not of themselves sufficiently show that the defendant was so notified that it was bound to comply with the ordinance, yet, in view of the holding in the *Carlin* case, and the added evidence in this case that the defendant repaired and maintained a fence from time to time between March, 1890, and the time of the accident, we are bound to hold that the plaintiff's evidence fairly tended to show that the defendant had been notified to fence its tracks; that it at one time fenced them at the place in question, and from time to time repaired and undertook to maintain that fence, and had for a long time enjoyed the benefit of operating its trains at a speed only permitted where the tracks are fenced. We are of the opinion, therefore, that there was ample evidence to justify the jury in determining that the defendant had failed in its duty to fence the place in question.

Was the absence of a fence the proximate cause of the injury? As said by Mr. Justice Thompson in the *Curran* case, *supra:* "Failure to comply with the ordinance is merely prima facie evidence of negligence. If the failure to comply with the ordinance does not cause or contribute to cause the injury complained of, such failure does not impose a liability." Citing,

*Gibson v. Leonard,* 143 Ill. 182; *Seith v. Commonwealth Elec. Co.,* 241 Ill. 252.

In the *Curran* case it was held that failure of the railroad to fence its tracks pursuant to the terms of an ordinance was not the proximate cause of an injury to one struck by a train on a parallel track belonging to another railroad company which had also failed to fence its tracks, even though the one injured, in order to reach the place where he was struck, had crossed the tracks of the first railroad company. That holding was followed in the *Carlin* case, *supra.*

In *Heiting v. Chicago, R. I. & P. Ry. Co.,* 252 Ill. 466, where a boy ten years and eight months old, on his way to school with several other boys, went through an opening in the fence along the railroad track, which fence was partly torn down, and, as he got upon the railroad track heard the school bell ring and at the same time saw a long freight train coming from the north on the west track, began to run south along the track, with the intention of reaching the Ninety-seventh street crossing before the train, but while running along the west end of the ties on the west passenger track, slipped and fell under the train, and as a result had to have one of his feet amputated, Mr. Justice Dunn said, confirming a judgment for the plaintiff: "If it can reasonably be concluded from the evidence that the accident would not probably have happened except for the failure of the appellant to fence its track, then it follows that the neglect to fence was the proximate cause of the accident, unless some other disconnected efficient cause which could not have been foreseen by the exercise of ordinary care has intervened." The learned Justice then quotes with approval from *Hayes v. Michigan Cent. R. Co.,* 111 U. S. 228, the following language: "It is further argued that the direction of the court below was right because the want of a fence could not rea-

sonably be alleged as the cause of the injury. In the sense of an efficient cause, *causa causans,* this is no doubt strictly true; but that is not the sense in which the law uses the term in this connection. The question is, was it *causa sine qua non?*—a cause which, if it had not existed, the injury would not have taken place,—an occasional cause? And that is a question of fact, unless the causal connection is evidently not proximate.'' Citing, *Milwaukee & St. P. R. Co. v. Kellogg,* 94 U. S. 469; *Daniel v. Metropolitan Ry. Co.,* L. R. 3 C. P. 216-222; *Williams v. Great Western Ry. Co.,* L. R. 9 Exch. 157.

It is urged that the proximate cause of the injury was the undertaking of the plaintiff to get on after he had arrived near the moving train. In answer to that it may be said, as in the *Heiting* case, *supra:* ''It is true that this was the voluntary act of the appellee, but it was not an independent intervening cause which the appellant could not have anticipated. On the contrary, if the appellant was negligent in failing to fence its track as required by the ordinance, and by such negligence suffered children to come upon its tracks, it might by the exercise of reasonable diligence have anticipated that precisely such an accident would happen as did happen.''

Following the *Carlin* case, the Supreme Court in the *Livak* case, considered the general question as to what extent the absence of a fence might be the proximate cause. In that case, which involved an injury to a five-year old boy who had crossed the tracks with his mother to pick some flowers, and then when returning and recrossing the tracks, tripped and fell and was run over, Mr. Justice Duncan said:

''It was at least a question for the jury as to whether or not the plaintiff in error would have been likely to go upon the tracks if such fence had been built, and consequently a question of fact as to whether or not such failure to build fences or walls was the proximate cause of his injury. To hold that

the boy was a trespasser and not entitled to recover would be, in effect, to defeat the very object of the ordinance, as we have previously held, and we are not disposed to overrule the decisions in either of the foregoing cases.''

Our attention has been directed to *Seymour v. Union Stock Yards & Transit Co.,* 224 Ill. 579. That was an attractive nuisance case, and, in the course of the opinion, Mr. Justice Scott said: ''In the case at bar appellant was attracted by the clay piled along the railroad track. He went upon the pile and was there at play and while so engaged was in no danger. As the train passed, the boy, no longer absorbed by the attractions of the bank of earth, began touching, playing with and running alongside the slowly moving cars, and finally fell under them, sustaining the injury complained of.'' There, quite obviously, ''an element intervened between the actions induced by the allurements of the clay pile and the injury.'' As the language of the court suggests, while playing on the pile of clay, which was alleged to be the attractive nuisance, he was in no danger; it was only when he undertook to do something else which was distinct from playing on the clay bank, that was, running alongside the cars that were passing and touching them with his hands. In that case the court further said: ''The proximate cause of the injury in this case was not the pile of clay, nor any danger with which the boy was brought in contact while gratifying any curiosity or desire excited by that pile. The injury was proximately caused by the movements of appellant in placing his hands upon and in running alongside the cars.'' In the instant case the charge is that the absence of the fence directly brought into being, as the logical result of a series of connected and reasonably to be expected circumstances, the motions of the plaintiff when actually physically undertaking to climb on the train.

Proximate cause is a phrase which it is difficult to

define. What it is depends necessarily upon the particular facts of the case. From the plaintiff's testimony, the first thought he had of getting on the train came to his mind when he was in the bushes, east of the right of way, and inspired by that, he determined to run across the intervening space and get on the train. His desire, his intention, his will, his overt conduct, all taken together, in all probability, led to his final physical attempt to get on the train. Whether, therefore, if there had been a fence intervening as a barrier his conduct would have been different was a question for the jury. In the *Heiting* case the court said:

"The question for our determination is whether there was any evidence requiring the submission of the question of proximate cause to a jury, and if the facts are such that men of ordinary judgment may arrive at different conclusions as to whether or not a fence would probably have prevented the accident, then the condition was such as required the submission of the case to the jury."

It is urged that the plaintiff was guilty of contributory negligence, and that his negligent conduct "intervened as a disconnected efficient cause which could not have been foreseen by the exercise of ordinary care on the part of the defendant." The defendant cites in support of the charge of contributory negligence, *Griffin v. Chicago & W. I. R. Co.*, 101 Ill. App. 284. In that case, however, the boy was nine and a half years old, and, as the court said, "at the least a boy of fair intelligence and discretion," whereas, in the instant case the plaintiff is only seven years and ten months old; and it is common knowledge that there is a vast difference in intelligence between a normal child of that age and one of nine and a half years. Further, there is no evidence in the record by which we may judge of his capacity, save that he was seven years and ten months old, and had been going to school since he was five years of age.

Whether he was precocious, normal or subnormal, is not shown. Of course, the trial judge and the jury saw him, and that was, in all probability, some evidence as to his capacity which we do not have.

In *Chicago & A. R. Co. v. Becker*, 76 Ill. 25, where a child, between six and seven years of age, attempted to cross a railroad track in front of a train which he could not have failed to see, and stumbled and fell upon the tracks and was run over and instantly killed, Mr. Justice McAllister treats very elaborately the subject of contributory negligence as imputable to minors. He quotes, with approval, from Wharton on Negligence, sec. 301, as follows: "The plaintiff, as a rule, must be a person to whom the alleged contributory negligence is imputable, excluding, therefore, persons distracted by sudden terror; persons of unsound mind, and drunkards; persons deprived of their senses; infants." The opinion in the case contains the following: "Whether the question of the capacity of children of observing and avoiding danger be considered with reference to contributory negligence on the part of the child injured, * * * it is obvious that no definite rule of law can be laid down which should interfere with the jury judging each case on its own merits and by its particular circumstances. If the child, from its age and experience, be found to have capacity and discretion to observe and avoid danger, it should be held responsible for the exercise of such measure of capacity and discretion as it possesses. The question is similar, and to be determined by the jury in the same way, from facts and circumstances in evidence, as where the capability of an infant, under the age of fourteen years, to commit crime, is involved in a criminal prosecution at common law against such infant. * * * But there is no inflexible rule which governs where the question arises in civil cases whether contributory negligence is imputable. As stated above, it is in each

case a question for the jury, to be determined upon the particular circumstances in evidence." The court further said in that case in discussing an instruction, that: "The age, the capacity and discretion of the deceased to observe and avoid danger, were questions of fact to be determined by the jury, and his responsibility was to be measured by the degree of capacity he was found to possess."

It is the rule in this State, as evidenced by the decisions of the Supreme Court, that a child under seven years of age is incapable of such conduct as constitutes contributory negligence. *Richardson v. Nelson,* 221 Ill. 254. Concerning a child seven years and three months old (within seven months of the age of the plaintiff), where the defendant charged contributory negligence, the court said, in *Chicago, St. L. & P. R. Co. v. Welsh,* 118 Ill. 572: "It is obvious, plaintiff was too young, at the time she was injured, to observe any care for her personal safety." Considering the question of discretion in a child and its consequent responsibility for negligence and whether it should be determined by the trial judge upon the testimony, or was one for the jury, the court said in *Evansich v. Gulf, C. & S. F. Ry. Co.,* 57 Tex. 126: "In no class of cases can this practical experience (of juries) be more wisely applied than in that we are considering. We find, accordingly, that although not uniform or harmonious, the authorities justify us in holding in the case before us that although the facts are undisputed, it is for the jury and not for the judge to determine whether proper care was given." Some States have gone so far as to hold that a child under eight years of age cannot be held guilty of contributory negligence. *Taylor v. Delaware & H. Canal Co.,* 113 Pa. St. 162, 8 Atl. 43; *Thomas v. Southern Pennsylvania Traction Co.,* 270 Pa. 146, 112 Atl. 918. *Fezler v. Willmar & S. F. Ry. Co.,* 85 Minn. 252, is cited; but there the boy was in his eleventh year.

No case has been cited and we know of none where the court has said that certain conduct on the part of a child of seven years and ten months must be considered, as a matter of law, as proving contributory negligence.

In our judgment, the question of proximate cause and, also, the question of contribuory negligence, and whether the latter "intervened as a disconnected efficient cause which could not have been foreseen by the exercise of ordinary care on the part of the defendant," were properly submitted to the jury, and, further, it is our judgment that the determination of the jury upon that matter cannot reasonably be considered as clearly against the weight of the evidence.

It is contended that the court erred in refusing to instruct the jury that if the plaintiff "at and immediately prior to the time of the happening of the accident in question went upon the right of way of the defendant railroad company and flipped or attempted to climb onto the freight car in question of his own initiative and accord and not because of the fact that there was no fence along the right of way of the railroad company, then and in such case you should find the defendant not guilty."

The question in this case is whether, in the language of Mr. Justice Dunn in the *Heiting* case, *supra*, "it can reasonably be concluded from the evidence that the accident would not probably have happened except for the failure of the appellant to fence its track." The instruction in question seems to be ambiguous. It puts in juxtaposition the idea of his going on the tracks as a result of his own "initiative" and a reason for his going. In the form in which it was presented, we think it was properly refused.

Are the damages excessive? The injury sustained was the loss of part of the right leg, the amputation being five inches below the knee. The judgment on the verdict includes not only the personal injury but,

also, whatever the father might have for the loss of the son's services during his minority. *American Car & Foundry Co. v. Hill*, 226 Ill. 227; *Chicago Screw Co. v. Weiss*, 203 Ill. 536. Having lost a leg, he is immeasurably handicapped. In the strenuous struggle for a livelihood and for preferment and for the esteem of his fellows, he starts lame, with a mutilated body. That is a grievous calamity. The impairment cannot be appraised, scientifically, in money, and so it has to be left to the sound discretion of the jury; and when they have fixed the amount, the court will not ordinarily interfere with the verdict. Is the amount here "flagrantly outrageous and extravagant?" (Chief Justice Kent in *Coleman v. Southwick*, 9 Johns. (N. Y.) 45.) Does it "strike everyone with the enormity and injustice of it?" (Id.) Considering the present purchasing power of money, a verdict that ten or more years ago might have seemed extravagant and unjust may be well within the bounds of reason.

Many cases on the subject have been cited, and we have examined them; and considering the analogous cases, the principles of law involved and the evidence, and the economic condition of the times, of which we take judicial notice, we are convinced that we ought not to override the verdict.

Finding no substantial error in the record, the judgment will be affirmed.

*Affirmed.*

O'CONNOR, P. J., concurs.

MR. JUSTICE THOMSON dissenting: I am unable to concur in the foregoing decision. From the testimony of the plaintiff himself, it may not be said whether, when he left the crosswalk at the 103rd street crossing and walked in a southerly direction along the east side of the defendant's right of way, he had any definite objective. It is certain, however, that he went to the rubbish pile located on the right of way and

looked for some rubber bands, after which he walked over to some bushes located a few feet east of the east line of the right of way, where he looked over some newspaper funny pictures, and from there he returned to the right of way and crossed over the defendant's tracks and attempted to jump on the freight train, which was coming along slowly on the third track. In my opinion, under such circumstances, the absence of a fence may not be said to have had anything to do with the plaintiff's injury. He entered the right of way at a point where the defendant was not required to maintain a fence or any other protection, and in this respect the case at bar differs from the many fencing cases cited in the plaintiff's brief, in which the person injured entered a railroad right of way, at a point which was unprotected, but at which the law required the railroad to maintain a fence. In my opinion the situation is not changed by reason of the fact that after the plaintiff, in the case at bar, entered the defendant's right of way at 103rd street and went down to the point where the rubbish pile was located, and then went over to the point where he found the funny pictures, he stepped off the right of way a few feet. As pointed out by counsel for the defendant, if this boy had entered the defendant's right of way at the crosswalk over the right of way at 103rd street, and gone down to the rubbish pile located on the right of way, and from there had run across the tracks and had attempted to board a train and been injured, there could be no doubt of the fact that the defendant could not be held liable in damages. If the plaintiff had had a companion with him on the occasion in question, who took that course while the plaintiff took the course he did take, as described above, it would not seem reasonable to hold that the plaintiff's companion could not recover while the plaintiff could recover, because before he ran across the tracks he happened to step outside the right of

way a few feet.   Even if there had been a fence at this point and the plaintiff had gone upon the right of way as he did, if the fence had been sufficient to prevent his re-entering the right of way after leaving it, it would doubtless have been sufficient to prevent his leaving the right of way after having gotten upon it as he did at 103rd street.   Counsel for the plaintiff states in the plaintiff's brief that this argument has been advanced in previous fencing cases and been answered by the courts contrary to the defendant's contention, citing *Livak v. Chicago & E. R. Co.*, 299 Ill. 218.   In that case, however, the plaintiff did not get onto the defendant's right of way at a street intersection, where no protection was required across the right of way, but rather at a point along the right of way at which the law required the railroad company to maintain a fence.   In this connection, counsel for the plaintiff cite the case of *Mattes v. Great Northern R. Co.*, 100 Minn. 34.   That case, however, differs from the case at bar in that the law applicable there required the railroad company to maintain proper cattle guards at highway intersections, and the court pointed out in that case that if the railroad right of way had been fenced and proper cattle guards had been maintained at the highway intersection, the tracks would have been "completely inclosed," and for that reason it was unnecessary to consider whether the boys involved in that case entered the highway at a place where the cattle guards should have been constructed, or at some other place.

I am further of the opinion that even if it be considered that the failure of the defendant to maintain a fence along the east side of its right of way, from the building in which the swimming pool was located to 103rd street, was negligence upon defendant's part, and a contributing cause to the injuries received by the plaintiff, it should be held that such negligence was not the proximate cause of those injuries.   It

was not *causa sine qua non.* A consideration of this
question does not involve the question of contributory
negligence. It was pointed out in *Anderson v. Kar-
stens*, 218 Ill. App. 285, that one may be precluded
from recovering damages for injuries received by him
because of his own acts, even though he is too young
to be held guilty of contributory negligence. Such
was the case in *Seymour v. Union Stock Yards &.
Transit Co.*, 125 Ill. App. 61; 224 Ill. 579. There the
court held that the movements of the boy (eight years
of age) who was injured, in placing himself in con-
tact with and running alongside the cars, was a posi-
tive act on his part which intervened between his
acts induced by the alluring clay piles and the injury,
and that this was the proximate cause of such injury,
and not the piles of clay. Judgment for the defend-
ant, on an instructed verdict based on this ground,
was affirmed. But the case at bar is an even stronger
case than that. Here the plaintiff was committing a
positive breach of the law at the time he was injured.
(Cahill's Ill. St. ch. 114, par. 95, sec. 17.) In *Knick-
erbocker Ice Co. v. Leyda,* 128 Ill. App. 66, this court,
quoting from *Newcomb v. Boston Protective Depart-
ment,* 146 Mass. 602, said: "No case has been brought
to our attention, and upon careful investigation we
have found none in which a plaintiff, whose violation
of law contributed directly and proximately to cause
him an injury, has been permitted to recover for it,
and the decisions are numerous to the contrary."

This court has previously had occasion to hold that
a plaintiff was precluded from recovery, as a matter
of law, under circumstances almost identical with
those presented in the case at bar. *Griffin v. Chicago
& W. I. R. Co.*, 101 Ill. App. 284. We there held that
the failure to fence was not the proximate cause of
the accident but rather that it was the positive inter-
vening act of the plaintiff in going upon the railroad
tracks and jumping or attempting to jump on a mov-
ing train.

In *Heiting v. Chicago, R. I. & P. Ry. Co.*, 162 Ill. App. 403, the plaintiff and other boys with him, in crossing over the railroad, did not attempt to jump onto the cars or to touch them, but in running alongside the track the plaintiff stumbled and fell under the train. That situation was there distinguished from those involved in the *Seymour* case and the *Griffin* case, this court saying: "In each of these cases the boy injured, or killed, was touching or attempting to touch or to board a moving train, which would seem to be an intervening efficient cause, and distinguishable from the present case." This case was affirmed by the Supreme Court in *Heiting* case, 252 Ill. 466, the court pointing out that the plaintiff had chosen the ends of the railroad ties as a place to run along, on a track next to a moving train, and that while this was his voluntary act, "it was not an independent intervening cause which the appellant could not have anticipated." The court went on to say: "On the contrary, if the appellant was negligent in failing to fence its track as required by the ordinance, and by such negligence suffered children to come upon its tracks, it might by the exercise of reasonable diligence have anticipated that precisely such an accident would happen as did happen."

In the case at bar, however, a different situation is presented. Here, the plaintiff committed acts expressly prohibited by the law, in going over the tracks after a moving train and taking hold of it and attempting to get on it. As was said in the *Griffin* case, this was none the less an unlawful thing, because under the statute the plaintiff could not have been punished therefor, by reason of his age. Even if a crime or a misdemeanor cannot be charged against them, infants are civilly accountable for their torts, and there is no statute prescribing an age at which they are not obliged to suffer the consequences of their own unlawful acts.

In my opinion, the foregoing proposition is in no sense contrary to the holdings of the Supreme Court in *Carlin v. Chicago & W. I. R. Co.*, 297 Ill. 193, and *Livak v. Chicago & E. R. Co.*, 299 Ill. 227, relied upon by the plaintiff, in which cases the court said, in effect, that to hold that the plaintiff was a trespasser, and for that reason not entitled to recover, would be in effect to defeat the very object of the fencing ordinance. The point is not made in the case at bar that the plaintiff was merely a trespasser, but that he so far went out of his way as to run across two railroad tracks, and, according to the testimony of a number of witnesses, in disregard of the warnings of several of the defendant's employees on the freight train in question, did something that the law has gone so far as to expressly prohibit and attempt to jump on this moving train. Nor, in my opinion, is the case of *Lerette v. Director General*, 306 Ill. 348, also relied upon by the plaintiff, an answer to the foregoing proposition. In that case the Supreme Court held that the mere fact that at the time the plaintiff was injured he, himself, was violating the law, will not, in and of itself, necessarily defeat his recovery, and that such will not be the case *"unless the unlawful act in some way proximately contributed to the accident in which he was injured."* In that case there was some question as to whether the illegal act of the plaintiff, in climbing over a bumper between two cars of a train which was standing still when he started through but which was started with a jerk, as he was on the bumper, and threw him off, was the proximate cause of his injury, or whether that cause was the fact that the cars were moved at the time and in the manner they were moved. That situation, in my opinion, is not presented here, where no question is raised as to the movement of the train or the manner in which it was operated, and clearly, in my opinion, the proximate cause of the plaintiff's injury was his act in attempting to jump on the moving train.

Plaintiff also relies upon the case of *Hayes v. Michigan Cent. R. Co.*, 111 U. S. 228, where a boy of eight or nine years of age, bright and well grown, but deaf and dumb, apparently entered the right of way of the defendant railroad at a point where the law required it to maintain a fence, but at which point there was none; and where the evidence showed that the boy was running along beside a moving freight train, and as he ran he turned and fell and was run over. The evidence showed that the boy had his hands out toward the car, as he ran, as if he was reaching after it, and "seemed to be drawn around by the draft of the train and fell on his back." Counsel for the plaintiff argue that if the running of the boy alongside of the train, as in the *Heiting* case, *supra,* and his reaching out toward the cars, as in the *Hayes* case, *supra,* was held, as in those cases, not to defeat his right to recover damages, how can it be said, in the case at bar, that if the boy gets hold of the train and attempts to get on it, then the plaintiff cannot recover? In my opinion, the distinction between the cases is clear. By our statute, taking hold of a moving train and attempting to board it is prohibited and made a misdemeanor. In neither of the cases referred to did the boy involved do the thing thus prohibited. He did not even attempt to do it in the *Heiting* case, and it is not at all clear that he did in the *Hayes* case.

For the reasons stated, I am of the opinion that the judgment appealed from should be reversed.